IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| UNITED STATES OF AMERICA, | ) | |
|---|---|---|
| | ) | |
| v. | ) | 2:18-cr-00171 |
| | ) | |
| DATWON LYONS, | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

**Mark R. Hornak, Chief United States District Judge**

A grand jury returned a one-count indictment charging Datwon Alvone Lyons ("Defendant") with being a felon[1] in possession of a firearm, in violation of 18 U.S.C. § 922(g)(1). (ECF No. 1.) Now before the Court are three (3) pretrial motions by the Defendant: (1) Motion to Suppress Evidence (ECF No. 27); (2) Motion to Produce Evidence the Government Intends to Use Under FRE 404(b) and 609 (ECF No. 29); and (3) Motion for Discovery (ECF No. 30). For the reasons set out in this Opinion, the Motion to Suppress Evidence is denied. The Court will address the remaining motions at ECF Nos. 29 and 30 in its Pretrial Order.

The principal remedy the Defendant seeks is suppression of all evidence obtained incident to the Defendant's seizure and arrest on March 25, 2018—chiefly the firearm that officers recovered near the Defendant before they arrested him. The Government responded to the Defendant's Motions and the Court held a suppression hearing. (ECF Nos. 34, 38.) At the hearing, defense counsel sought to enter recordings of radio transmissions from the day of the arrest into evidence conditioned upon the Government's ability to obtain the recordings. (ECF No. 41, at 96–

---

[1] The Government alleges that the Defendant was convicted of four felonies in state court: (1) murder of the third degree (on June 2, 2006); (2) carrying a firearm without a license (June 2, 2006); (3) possession of cocaine after a prior conviction (January 14, 2005); and (4) delivery of cocaine and possession of cocaine with intent to deliver (October 20, 2003). (ECF No. 1.)

97.) The Government stated no objection but later filed notice with the Court that Allegheny County deleted the recordings pursuant to its records retention policy and thus could not supply the recordings. (ECF No. 40.) After receiving testimony at the suppression hearing, the Court ordered a transcript in anticipation of post-hearing briefs. (ECF No. 41, at 14.) The Defendant then filed his Proposed Findings of Fact and Conclusions of Law, to which the Government responded. (ECF Nos. 45, 48.) The Defendant replied and this matter became ripe for disposition. (ECF No. 49.)

## I.   **FACTUAL FINDINGS**

Testifying for the Government at the suppression hearing was Officer John Zelen ("Officer Zelen") of the Braddock and Edgewood, Pennsylvania police departments. (ECF No. 41, at 2. ("Tr.")) Testifying for the Defendant was an investigator with the Federal Public Defenders office, Milica Bogetic ("Investigator Bogetic"). (*Id.*)

"It is well-settled that at a hearing on a motion to suppress, the credibility of the witnesses and the weight to be given the evidence, together with the inferences, deductions and conclusions to be drawn from the evidence, are all matters to be determined by the trial judge." *United States v. Harris*, 884 F. Supp. 2d 383, 387 (W.D. Pa. 2012) (internal citations and quotations omitted). Based on the Court's consideration of the testimony and demeanor of the witnesses at the suppression hearing, the Court finds and concludes that both Officer Zelen and Investigator Bogetic were credible. The Court makes the following factual findings based on their testimony and consideration of the record.[2, 3]

---

[2] The record includes a recording of a 9-1-1 phone call, which the Government presented in redacted form to exclude the first and last name that the caller provided to the dispatcher. (*Id.* at 16:6–14.)

[3] The Court also considered the Joint Stipulation of Fact on what Braddock Police Officer Sha'Ron Jackson would have testified if called as a witness in the suppression hearing. (ECF No. 39; *see also* Tr. at 10:22–11:12.)

Around 5:32 p.m. on March 25, 2018, a woman placed a 9-1-1 call lasting just over two minutes, which reported her seeing two men in possession of firearms by the side entrance of an apartment building on Talbot Avenue in Braddock, Pennsylvania ("apartment building"). (Government's Exs. 1A; 3.) The woman's voice is at times both hushed and urgent. (Government's Ex. 1A.) After providing an address, she tells the dispatcher, "you gotta hurry up to the side entrance. They got guns." (*Id.*) She reiterates that "they" are at the side entrance of the apartment building and then, in response to the dispatcher's question about whether they have weapons, she says, "Yes, come ASAP." (*Id.*) "Is it a gun or a knife," the dispatcher asks. (*Id.*) The caller replies, "it's guns. Please hurry up." (*Id.*) When the dispatcher asks, "what do they look like," the caller responds, "are you coming?" (*Id.*) The dispatcher assures her police are on the way and the caller then describes two black males, one wearing a black jersey. (*Id.*) The dispatcher asks the caller for her first and last name, which the caller provides. (*Id.*; Tr. at 16:6–14.) When the dispatcher asks for a phone number, the caller replies, "my phone don't work." (Government's Ex. 1A.) The dispatcher ends the call soon after. (*Id.*)

Officer Zelen and Officer Sha'Ron Jackson ("Officer Jackson") both immediately and separately responded to the police dispatch, which stated that there were two black males in possession of firearms at the side of the entrance of the apartment building. (Tr. at 19:18–22, 20:16–18, 23:19–24.) The apartment building was known to Officer Zelen as a "troublesome spot in the neighborhood." (*Id.* at 19:25.) Officer Zelen based this on the fact that the police routinely got calls to the apartment building for fights, serving warrants, serving protection from abuse orders, and domestic violence incidents. (*Id.* at 20:12.) Officer Zelen considered the dispatch a "priority call" because of the involvement of firearms and imminent threat thus posed to officers and the public. (*Id.* at 21:2–9.)

- 3 -

Officer Zelen arrived shortly after Officer Jackson at around 5:36 p.m.—within five (5) minutes of the 9-1-1 call—when it was still "very bright" outside. (*Id.* at 23:19–24, 49:16–17, 80:15–17.) Both officers arrived in marked police vehicles. Officer Zelen testified that he did not have his lights or siren on. (*Id.* at 58:3–8.) Officer Zelen parked his police car in front of the apartment building, and Officer Jackson and he walked towards the side entrance of the apartment building. (*Id.* at 23:18–24:3.) Using a walkway between the building and a chain link fence, Officer Zelen cautiously approached an individual standing right outside the side entrance. (*Id.* at 24:4–16.) The side entrance abutted an empty lot, making the entrance more easily visible from Talbot Avenue. (*Id.* at 24:4–5; Government's Ex. 2.)[4] There was no one else in the area, nor were there other people coming in or out of the apartment building at the time Officers Zelen and Jackson observed this individual. (Tr. at 44:12–22.) Officer Jackson approached the individual from the empty lot on the opposite side of the chain link fence. (*Id.* at 24:4–5.) The individual, who turned out to be the Defendant, matched the description given in the 9-1-1 dispatch. (*Id.* at 24:19–20.) Officer Zelen observed the Defendant, an African American male, wearing a Pittsburgh Penguins hockey jersey[5] and blue jeans. (*Id.* at 24:19–23, 52:10–12; Def.'s Mot. to Suppress, Ex. C, ECF No. 27-4.) The jersey was mostly black in color, with yellow and white on the sleeves and along the sides. (ECF No. 27-4.) The Defendant's hands were both visible and he held only a can of an alcoholic beverage. (Tr. at 44:1–11, 76:4–7.) No gun was visible. (*Id.*) Officer Zelen was only able to testify with certainty that he knew the suspects were reportedly male and African American when he arrived at the scene. (*Id.* at 50:21–23.) He could not recall exactly at what point he became

---

[4] Government's Exhibit 2 is a demonstrative, which is a satellite view of the apartment building and shows the empty lot next to the side entrance where officers made contact with the Defendant.

[5] Notably, the 9-1-1 caller specifically used the word "jersey" as opposed to "shirt," "jacket," "sweatshirt," or the like in describing the outerwear involved.

aware that the description included a black jersey. (*Id.* at 51:19–25.)

Officer Jackson remained nearby on the other side of the fence as Officer Zelen approached the Defendant and asked for his identification, keeping some distance between himself and the Defendant. (*Id.* at 25:6–12.) The Defendant's demeanor was cooperative and he provided his identification, which Officer Jackson ran through a police database. (*Id.* at 52:17–19, 60:8–10.) Officer Zelen kept his eyes on the Defendant during this interaction for officer safety reasons. (*Id.* at 60:11–14.) Given that the Defendant's race, sex, and location matched the 9-1-1 call, and concerned that the Defendant was armed, Officer Zelen informed the Defendant that he intended to perform a pat-down search (hereinafter referred to as a "*Terry* frisk") for officer safety reasons. (*Id.* at 25:19–26:24.) After announcing his intention to conduct a *Terry* frisk of the Defendant, Officer Zelen reached towards the Defendant with his hand and made momentary, physical contact. (*Id.* at 26:3–7, 62:4–6.) From Officer Jackson's vantage point, he believed that Officer Zelen had made physical contact with and had begun a *Terry* frisk of the Defendant at that time. (ECF No. 39.)

At the moment of contact, the Defendant almost immediately fled. (Tr. at 25:25–26:9.) This entire interaction lasted no more than a minute. (*Id.* at 26:12.) Officer Zelen pursued the Defendant with his service weapon drawn and giving verbal commands to the Defendant to stop and show his hands. (*Id.* at 27:20–28:15.) Officer Zelen briefly touched the Defendant again during the chase but could not secure him enough to grab him. (*Id.* at 28:11–13.) The Defendant ran across Talbot Avenue and entered the property of a single-family home on Cherry Way, in between the home and fence that ran along the perimeter. (*Id.* at 29:18–22.) At this point, Officer Zelen slowed his pace down but never lost sight of the Defendant during the foot chase. (*Id.* at 28:19–21, 69:8–22.) The fence surrounding the Cherry Way home was rundown and Officer Zelen could see the

Defendant's movements on the other side of the fence through several openings and missing parts. (*Id.* at 29:6–30:12.) Officer Zelen paused and saw the Defendant's silhouette behind the fence as the Defendant moved back and forth and then crouched down. (*Id.* at 30:5–12, 70:1–6.) He believed these furtive movements might be the Defendant taking up an offensive position. (*Id.*)

At this point, another officer from the Braddock Police Department ("Officer Lincoln") arrived at the scene in a marked police vehicle. (*Id.* at 30:14–16.) The Defendant then ran into the fenced-in backyard of the Cherry Way home, where he became trapped. (*Id.* at 30:17–22.) Officers Zelen, Jackson, and Lincoln were then able to take the Defendant into custody. (*Id.*) Officer Zelen's police incident report states that the Defendant was detained at this time, but not under custodial arrest. (Def.'s Mot. to Suppress Evid., Ex. A, ECF No. 27-2, at 2.)

At no point during this interaction did Officer Zelen see the Defendant possessing a gun. (Tr. at 75:23–76:7.) After taking the Defendant into custody, Officer Zelen began to search the immediate area. (*Id.* at 30:23–25.) Underneath a garbage can near where Officer Zelen had seen the Defendant crouch down, Officer Zelen recovered a handgun. (*Id.* at 31:1–4.) The gun appeared in good condition and not as if it had been left outside for a long time.[6] (*Id.* at 31:9–13.) Throughout this entire encounter and chase, Officers Zelen and Jackson were in uniform, displaying their badges, and carrying their service weapons. (*Id.* at 58:9–59:4.) Later attempts to contact the 9-1-1 caller were unsuccessful. (*Id.* at 55:12–14.)

In relation to the litigation of this Motion, Investigator Bogetic visited the area near the apartment building on Talbot Avenue and the residential home on Cherry Way three (3) times

---

[6] The police "call sheet" corroborates many of the events described up to this point. (*See* ECF No. 27-3.) The call sheet describes the initial 9-1-1 call, the description of the situation, the priority of the call, the description and location of the suspects, the suspected presence of a gun, the Defendant's flight and the officers' pursuit, and the recovery of the firearm. (*Id.* at 1–2.)

while on assignment from the Federal Public Defenders' office. (*Id.* at 91:18–92:2.) She noted that the race of persons in that area was mostly African American and the residents of the apartment building on Talbot Avenue were ninety-eight (98) percent African American at the time of her investigation.[7] (*Id.* at 92:8–93:9.)

## II. DISCUSSION

The Defendant argues that either his initial seizure or his arrest, or both, were unconstitutional and the evidence recovered from his person and/or surroundings should be suppressed. The Court will address each argument and event chronologically.

### A. Initial Contact between Officer Zelen and the Defendant

The Fourth Amendment to the United States Constitution provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against *unreasonable* searches and seizures, shall not be violated." U.S. Const. IV (emphasis added, of course). The central, axiomatic inquiry under the Fourth Amendment is into the "reasonableness in all the circumstances" of the government's invasion—whether that be a stop, frisk, arrest, or "full-blown search." *Terry v. Ohio*, 392 U.S. 1, 19 (1968). The Supreme Court has held that the Fourth Amendment protects individuals, their property, and wherever an individual may harbor a reasonable expectation of privacy. *Id.* at 9 (citing *Katz v. United States*, 389 U.S. 347, 351 (1967)); *United States v. Jones*, 565 U.S. 400, 405–06 (2012).

Police officers are free to walk up to citizens in public and engage in discussion or ask them questions, as the law presumes this encounter to be consensual as long as the reasonable citizen would feel free to disregard the officers and go about their business. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). When that encounter loses its consensual nature, Fourth Amendment

---

[7] Investigator Bogetic's three (3) visits occurred during working hours, Monday through Friday, between the Fall of 2018 and the suppression hearing. (*Id.* at 93:19–94:3.)

scrutiny attaches. *Id.* A seizure under *Terry* is also known as an investigatory stop and requires officers have reasonable, articulable suspicion that criminal activity is afoot before they may restrain or detain a suspect. *See Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). A *Terry* frisk is a Fourth Amendment search, which requires that the officer first have a "reasonable belief" that a person is "armed and presently dangerous." *Ybarra v. Illinois*, 444 U.S. 85, 92–93 (1979). A *Terry* frisk cannot be a "cursory search for weapons," nor can it be for any purpose other than to search for weapons. *Id.* at 93–94 (discussing the "narrow scope" of the *Terry* exception).

Officer Zelen did not conduct a *Terry* frisk in this case. He announced his intention to do so. He briefly placed his hand on the Defendant to begin to do so. But the Defendant fled before Officer Zelen had a chance to frisk him. Thus, the first question presented is whether, under *Terry* and its progeny, Officer Zelen seized the Defendant when he first touched the Defendant. The Court concludes that case law compels the conclusion that Officer Zelen seized the Defendant when he momentarily touched the Defendant. In so concluding, the Court is nonetheless mindful of the Supreme Court's admonishment that "characterizing every street encounter between a citizen and the police as a 'seizure,' . . . would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

*1. Seizure by Show of Authority*

Any inquiry into an alleged seizure must begin by determining when the seizure would have occurred. *United States v. Smith*, 575 F.3d 308, 312 (3d Cir. 2009). A seizure occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen." *Id.* (citing *Bostick*, 501 U.S. at 434). The test is objective and does not depend on whether the individual perceived that he was being ordered to restrict his movement. *Id.* at 313.

When Officers Zelen and Jackson first approached the Defendant, there was no show of authority that restrained the Defendant's liberty. The interaction was exactly the "consensual encounter" that the Supreme Court and our Court of Appeals have routinely held does not constitute a seizure. *See id.*; *Bostick*, 501 U.S. at 434. When officers approach someone to ask questions, and even when they ask for identification as is the case here, no seizure occurs unless a reasonable person would not feel free to disregard the police and walk away. *Smith*, 575 F.3d at 312 ("'[e]ven when law enforcement officers have no basis for suspecting a particular individual, they may pose questions, [and] ask for identification' without running afoul of the Fourth Amendment's prohibitions."). In *United States v. Mendenhall*, the Supreme Court held that a court must make its show-of-authority assessment "in view of all the circumstances surrounding the incident." 446 U.S. at 554. Some factors that "*might* indicate a seizure, even where the person [does] not attempt to leave," include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* (emphasis added). However, these factors are necessary, but not necessarily sufficient, conditions for finding a seizure by show of authority. *Smith*, 575 F.3d at 313 (citing *California v. Hodari D.*, 499 U.S. 621, 628 (1991)). An individual must also *yield* to a show of authority for a seizure to occur. *Id.*

Here, more than one police officer approached the Defendant—Officers Zelen and Jackson. Both were in uniform, displaying their badges, and visibly carrying their holstered service weapons. (Tr. at 58:9–60:4.) Nothing in the record suggests that their presence was *per se* threatening and, at least at first, nothing demonstrates the officers used language or a tone suggesting that the Defendant's compliance would be compelled. Up until the point that Officer Zelen announced an intention to *Terry* frisk the Defendant and then briefly touched him, the

- 9 -

interaction was ordinary. Officer Zelen did not show up with his lights and siren ablaze. (*Id.* at 58:3–8.); *see United States v. Brown*, 765 F.3d 278, 289 (3d Cir. 2014) ["*Brown I*"] (finding no seizure by show of authority when officers "did not activate their lights or sirens, brandish their weapons, block [defendant's] path, physically touch [the defendant], or make any threats or intimidating movements"). Both officers walked towards the Defendant, *cf. United States v. Lowe*, 791 F.3d 424, 433–34 (3d Cir. 2015) (finding a seizure when the defendant stayed put as police sprinted towards him), and remained several feet away from the Defendant. (Tr. at 25:1–9.) Officer Jackson was also on the far side of a chain-link fence. (*Id.* at 25:8–10.) The Officers asked for and ran his ID through a database and the Defendant displayed a cooperative demeanor. (*Id.* at 25:6–15, 52:17–19, 60:8–10.) Until the Defendant fled, Officer Zelen and Officer Jackson did not unholster their service weapons. (*Id.* at 27:20–28:15.); *see Brown I*, 765 F.3d at 289 (highlighting the relevance of police brandishing their weapons).

The Defendant's argument that a reasonable person does not feel free to walk away when an officer possesses their ID is unavailing. The Defendant willingly gave his ID to Officer Jackson after the officers "asked him" for it, and his demeanor was "cooperative." (Tr. at 25:12–15, 52:17–19.) Nothing in the record suggests that the officers demanded or ordered the Defendant to do so. In view of all the circumstances, the officers had not seized the Defendant by show of authority. Being approached by uniformed police officers and asked to present ID in these circumstances would not ordinarily communicate to a reasonable person that they are not free to leave, and does not do so here. *Smith*, 575 F.3d at 312–13.

## 2. *Seizure by Physical Force*

The situation changed with one seemingly small action by Officer Zelen. The case law demonstrates that even slight physical force applied by an officer to an individual can constitute a

- 10 -

seizure of the person. *Hodari D.*, 499 U.S. at 625 (discussing seizure in the context of arrest) "A seizure occurs when there is . . . '*a laying on of hands* or application of physical force *to restrain movement*, *even when it is ultimately unsuccessful*,'" *United States v. Brown*, 448 F.3d 239, 245 (3d Cir. 2006) ["*Brown II*"] (emphasis added) (citing *Hodari D.*, 499 U.S. at 626) (discussing seizure in the context of a *Terry* stop). The Government cites this quote from *Brown II* several times throughout its Responses. (ECF Nos. 34, at 3, 4; 48, at 5, 12.) Yet, in each instance where it quoted this line from *Brown II*, the Government omitted the crucial bolded qualification. For a seizure analysis, it does not matter whether the laying of hands *in fact* restrained the individual's movement. What matters is whether police laid hands or used physical force in an effort to restrain movement. Officer Zelen admitted to making physical contact with the Defendant in order to frisk him. (Tr. at 26:3–7, 62:4–6.) Officer Jackson witnessed this and also believed that Officer Zelen had actually begun conducting a *Terry* frisk. (ECF No. 39.) While it was ultimately unsuccessful because of the Defendant's near instantaneous flight, Office Zelen still touched the Defendant intending to search him, which necessarily requires seizure of the Defendant as well. Thus, this event was the first seizure of the Defendant. *See United States v. Dupree*, No. 08-280-1, 2009 WL 1475276 (E.D. Pa. May 27, 2009), *aff'd on other grounds*, 617 F.3d 724 (3d Cir. 2010) (finding a seizure where an officer grabbed a man on a bike for two seconds, stopping his movement, and who then immediately broke free and fled). While touching that is accidental or for purposes other than to restrain a suspect might not constitute a seizure, that is not what happened here. There is nothing "consensual" about a law enforcement officer touching a citizen in an effort to effect a *Terry* frisk, even if done briefly. *See Bostick*, 501 U.S. at 434.

*3. Fourth Amendment Reasonableness of Officer Zelen's Seizure of the Defendant*

Having concluded that Officer Zelen seized the Defendant in this moment, the inquiry turns

to the reasonableness of that seizure. To conduct an investigatory seizure of a suspect, the officer must have reasonable suspicion. *Brown I*, 765 F.3d at 290.

The Supreme Court held that "the level of suspicion the [reasonable suspicion] standard requires is considerably less than proof of wrongdoing by a preponderance of the evidence, and obviously less than is necessary for probable cause." *Navarette v. California*, 572 U.S. 393, 397 (2014) (citations and quotations omitted). The officer must have some objective justification for the stop and be able to articulate more than an "unparticularized suspicion or 'hunch'" that the suspect is engaged in criminal activity. *Brown I*, 765 F.3d at 290 (citing *Wardlow*, 528 U.S. at 124). When the Court makes a "reasonable suspicion" determination, it must look at the "totality of the circumstances of each case to see whether the detaining officer [had] a particularized and objective basis for suspecting legal wrongdoing." *Id.* (citing *United States v. Arvizu*, 534 U.S. 266, 273 (2002)). Put another way, an officer must have reasonable, articulable suspicion that criminal activity is afoot. *Id.* at 289. The Court must also give "considerable deference" to police officers' determinations of reasonable suspicion. *Id.* at 290 (citing *United States v. Mosley*, 454 F.3d 249, 252 (3d Cir. 2006)). This process allows officers in the field "to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." *Id.* (quoting *Arvizu*, 534 U.S. at 273). Therefore, a trained officer may even develop reasonable suspicion based on acts capable of innocent explanation. *United States v. Graves*, 877 F.3d 494, 499 (3d Cir. 2017).

Looking to the totality of the circumstances, the Court begins with the facts known to Officers Zelen and Jackson when they encountered the Defendant.[8] First, the race of the Defendant

---

[8] The facts known to the 9-1-1 dispatcher are imputed to the Officers. *See United States v. Torres*, 534 F.3d 207, 210 (3d Cir. 2008) ("the knowledge of the dispatcher is imputed to the officers in the field when determining the reasonableness of the *Terry* stop").

and of the suspects described in the 9-1-1 call was African American. Second, the Defendant was wearing a mostly black Penguins *jersey* and the 9-1-1 caller described one of the suspects as wearing a black *jersey*. Third, the Defendant was located at the side entrance of the apartment building, just where the 9-1-1 caller stated the suspects were located. Fourth, the apartment building was a "troublesome spot in the neighborhood," but not necessarily a high-crime area. (Tr. at 19:25.) Still, the police routinely got calls for fights, domestic violence, and service of warrants and protective orders in that area. Apart from the troublesome nature of the apartment building and visual observations of the immediate area, which alone would not support reasonable suspicion, the remainder of the information available to the Officers originated from the 9-1-1 call.

a. **Case Law**

While the 9-1-1 call in this case was not truly anonymous because the call was recorded and the caller provided her name to the dispatcher[9], the Court nonetheless can and will borrow the principles of case law in the anonymous tip context to evaluate the reliability of the 9-1-1 call here. *Brown II*, 448 F.3d at 249 ("The record before us does not fit neatly into the typical anonymous tip framework, as [the caller] made no effort to hide his identity and was known to [the victim]. Despite this distinction, we may still borrow underlying principles from the anonymous tip context to evaluate the reliability of [the caller's] tip."). The principles of Fourth Amendment reasonableness "apply with full force" to stops based on information from citizens' tips. *Navarette*, 572 U.S. at 397. When a tip shows "sufficient indicia of reliability," it may support reasonable

---

[9] *See United States v. Elmore*, 482 F.3d 172, 181 (2d Cir. 2007) ("The government points to several cases where other circuits have found reasonable suspicion based on tips from informants who gave their names or other identifying information, but where the police did not meet them face-to-face or otherwise confirm their identities. Despite the fact that their identities were not definitively confirmed, the Fourth, Ninth, and Tenth Circuits did not treat the informants as anonymous and did not require the extensive degree of corroboration needed to find reasonable suspicion under the *White/J.L.* framework."). *See also United States v. Terry–Crespo*, 356 F.3d 1170, 1174 (9th Cir. 2004) (holding where a 9-1-1 call was recorded and the caller gave his name but not his phone number, the calls "narrowed the likely class of informants," thus rendering the call not truly anonymous).

suspicion for an investigatory stop. *Id.* The informant's veracity, reliability, and basis of knowledge are closely intertwined issues that help "illuminate the commonsense, practical question of whether there is reasonable suspicion to support a *Terry* stop." *United States v. Torres*, 534 F.3d 207, 210–11 (3d Cir. 2008).

In the wake of *Terry v. Ohio*, the Supreme Court has addressed situations in which an officer's reasonable suspicion determination was based, at least in part, on an anonymous tip. In *Alabama v. White*, the police department received a call from an anonymous tipster that the defendant would be leaving a specific apartment at a particular time in a station wagon with the right taillight broken. 496 U.S. 325, 327 (1990). The caller also stated the defendant would be heading to a specific motel and that the defendant possessed cocaine in a brown attaché case. *Id.* Police later surveilled the defendant and watched her get into a car matching the exact description given, which she had parked in front of the specified apartment building, and drive towards the named motel. *Id.* She was not carrying any bags when police saw her get in the car. *Id.* Officers stopped the car before it could presumably reach the motel. *Id.* Police found a brown attaché case, which contained marijuana, in the car after they obtained consent to search the vehicle. *Id.* Cocaine was later found in her purse. *Id.* The propriety of the investigatory stop of the vehicle turned on the reliability of the anonymous call. The Court regarded *White* as a "close case" but held that the anonymous tip was reliable under the totality of the circumstances. *Id.* at 332. In so ruling, the Court held that "an anonymous tip that provided 'virtually nothing from which one might conclude that the caller is either honest or his information reliable' and that provided no information that independently provided a basis for suspecting criminal activity, was insufficient to support a *Terry* stop." *United States v. Nelson*, 284 F.3d 472, 479 (3d Cir. 2002) (discussing *White*, 496 U.S. at 329). However, because the police independently corroborated the tip, which itself contained

particularized information and reflected special familiarity with the suspect, police had sufficient reasonable suspicion to make the stop. *Id.* The "special familiarity" was demonstrated by the tipster's ability to predict the defendant's future behavior. *Id.*

In *Florida v. J.L.*, the Supreme Court held police did not have reasonable suspicion based on an anonymous call. A caller reported that a young African American man, standing at a bus stop and wearing a plaid shirt, was carrying a gun. 529 U.S. 266, 268 (2000). The call came in through a regular police telephone line and not through the 9-1-1 system. *Id.* Two officers then approached the bus stop in question and saw three young, African Americans—one wearing plaid. *Id.* None were acting unusually or threateningly, no weapons were evident, and none of them ran. *Id.* The officers frisked all three suspects and a gun was found on J.L., a sixteen-year-old. *Id.* at 268–69. The Supreme Court ruled that the stop was not justified, focusing on several factors: (1) the phone call was from an unknown caller and location; (2) the officers had no basis other than the tip to justify the stop and frisk; and (3) there was no police corroboration to suggest the caller had "inside knowledge about the suspect and therefore to credit his assertion." *Id.* at 270; *see also Nelson*, 284 at 477 (discussing *J.L.*). That the visible attributes and location described by the caller turned out to be accurate was of no moment. *J.L.*, 529 U.S. at 271. The Court observed, "[a]n accurate description of a subject's readily observable location and appearance is of course reliable in this limited sense: It will help the police correctly identify the person whom the tipster means to accuse. Such a tip, however, does not show that the tipster has knowledge of concealed criminal activity." *Id.* at 272. Rather, reasonable suspicion requires that the tip be "reliable in its assertion of illegality, not just in its tendency to identify a determinate person." *Id.* The Court was also deliberate in dispelling the notion that allegations of gun possession somehow lessen the reliability required. *Id.* at 273–74. But *J.L.* was not the last word on these issues.

The Supreme Court addressed this question again in *Navarette*, this time coming out the other way. In *Navarette*, the Court presumed for the purposes of its opinion that the 9-1-1 call at issue was anonymous, but still held that it was reliable. 572 U.S. at 398. The 9-1-1 caller reported a driver that had nearly run her car off the highway. *Id.* at 395. She gave the direction of the car, the mile marker, the make and model of the car, and its license plate. *Id.* Roughly eighteen minutes after the call, police pulled over the car nineteen miles away from the mile marker provided by the caller. *Id.* at 399. The Court found the call to be reliable enough to justify the stop. *Id.* at 402. As explained below, the fact that the call came in through the 9-1-1 emergency system lent support to the reliability analysis. *Id.* at 400. The Court also pointed to several details of the call which suggested the caller was an eyewitness to the dangerous driving. This "basis of knowledge [lent] significant support to the tip's reliability." *Id.* at 399. And the timing of the call versus the location of the *Terry* stop suggested that she placed the 9-1-1 call during or soon after witnessing the crime, lending it further reliability. *Id.*

Our Court of Appeals has addressed anonymous tips with some frequency as well. In *Nelson*, the Court addressed an anonymous tip reporting an armed robbery by two African American men in a gray BMW with tags in the rear window travelling on a specific street. *Nelson*, 284 F.3d at 475. A second anonymous call from a pay phone was placed, reporting similar information. *Id.* A car with passengers matching the description was later pulled over on the specific street provided by the caller. *Id.* The first anonymous tip, on which the Court focused, came through a private phone line disseminated only to informants and members of the officer's family, and the caller asked for an officer by name. *Id.* at 482. These facts allowed the officer who answered the call to reasonably infer that the caller was a trustworthy informant. *Id.* Further, the phone call could allow for potential identification of the caller by the officer who answered, if

- 16 -

necessary. *Id.* The caller also expressed that he was a victim of the criminal activity he was calling to report. *Id.* The *Nelson* court held that the "use of the private line and the officer's name, coupled with the accuracy and inside nature of the information, as well as its urgency, afforded the call sufficient indicia of reliability to arouse a reasonable suspicion." *Id.* However, the Court also emphasized that police must independently corroborate an anonymous tip, and that the corroboration is "measured by both the quantity and quality of the totality of the circumstances." *Id.* at 480. Thus, where a tip "contains information that later investigation contradicts, or that is of such a general nature as to be easily obtained by any observer, there is no reasonable suspicion." *Id.*

In *Brown II*, where the caller was not anonymous, the Third Circuit concluded that officers did not have reasonable suspicion to stop the defendant. A victim of an attempted robbery called 9-1-1 to report the crime before calling her friend and providing him with a general description of the perpetrators. *Brown II*, 448 F.3d at 241. An officer arrived and took a description of the suspects from the victim herself and then issued a broadcast over police radio that the suspects were two black males in their teens or twenties with dark clothing and provided approximate heights. *Id.* Minutes later the victim's friend called her back and stated he saw two men matching the description on a nearby street. *Id.* at 242. A second officer received that information and then drove to the location provided. *Id.* There, the officer stopped two African American men, who were of similar height and wearing dark clothing. *Id.* The area was mainly African American in population, and the men were walking normally and not out of breath. *Id.* The Court concluded that there was insufficient information to support reasonable suspicion. The Court noted that "an excessively general description, combined with an honest but unreliable location tip in the absence of corroborating observations by police, does not constitute reasonable suspicion." *Id.* at 252.

Furthermore, a tip, anonymous or otherwise, is not reliable "merely because its description of the suspect's visible attributes prove accurate." *Id.* at 250 (quoting *J.L.*, 529 U.S. at 271). The Court based its ruling on several matters occurring before the *Terry* stop. The description of the suspects was highly general, the defendant's age and facial hair did not match the description, the location information came from a second-hand source (the victim's friend), and the officer who made the stop did not corroborate any information or observe anything that might supplement the reasonable suspicion. *Id.* at 247–251.

In *Torres*, the Court analyzed a case in which an anonymous taxi driver called 9-1-1 to report another driver who had flashed gun at someone. 534 F.3d at 208. The caller identified the make of the car, the license plate, and the direction in which it travelled, as well as the race and sex of the driver. *Id.* The caller was also apparently following the other driver and detailed the driver's movements in real time to the 9-1-1 dispatcher. *Id.* at 208-09. At the moment officers stopped the suspect vehicle, the only information known to them originated from the 9-1-1 call. *Id.* at 210. The court then identified five (5) reliability factors for anonymous tips:

> (1) The tip information was relayed from the informant to the officer in a face-to-face interaction such that the officer had an opportunity to appraise the witness's credibility through observation.
> (2) The person providing the tip can be held responsible if her allegations turn out to be fabricated.
> (3) The content of the tip is not information that would be available to any observer.
> (4) The person providing the information has recently witnessed the alleged criminal activity.
> (5) The tip predicts what will follow, as this provides police the means to test the informant's knowledge or credibility.

*Id.* at 211. These factors are not applied rigidly and "a tip need not bear all of the indicia—or even any particular indicium—to supply reasonable suspicion." *Id* at 213; *see also United States v. Serrano*, 598 F. App'x 72, 75 (3d Cir. 2015) ("[w]e do not apply [the *Torres*] factors rigidly").

- 18 -

Other factors may bolster an otherwise insufficient tip, such as whether the suspect is in a high-crime area or on the street at a late hour, a suspect's suspicious behavior or flight from police, and a suspect's actions that conform "to police officers' specialized knowledge of criminal activity." *Torres*, 534 F.3d at 211. Resting on the fact that the 9-1-1 caller was a real-time eyewitness, providing a play-by-play and detailed descriptions, and because he provided information that would allow police to identify him, the tip was reliable enough to support reasonable suspicion to pull the car over. *Id.* at 212–13.

The above exposition on case law is necessary given that this case, as in *White*, presents a "close call." The Supreme Court decision in *J.L.* had facts quite similar to those in this case—a 9-1-1 caller reported gun-toting suspects in a readily observable area, provided a description that "was vague enough to describe any number of men," and was not predictive of the Defendant's future movements. *Torres*, 534 F.3d at 212 (discussing *J.L.*). But, as noted, *J.L.* was not the Court's last word on this topic in similar circumstances. The Defendant also argues that this case presents several similarities to the Third Circuit's *Brown II* case, including the asserted vagueness of the description and lack of external corroboration. Looking to the *Torres* factors, the first, third, and fifth factors also appear lacking. There was no face-to-face recounting of the events, the content of the tip could have been gathered by anyone who happened to see the Defendant standing outside at the side door, and the tip did not predict any future behavior of the Defendant. Police also did not conduct any corroboration "investigation" other than responding to the scene and seeing one person, but not two persons, matching the caller's description and in the readily observable place that the caller reported. There was no testimony, nor is there anything in the record to suggest, that the Defendant was behaving suspiciously when the officers arrived. Both of the Defendant's hands were visible to Officer Zelen and the Defendant was cooperative. (Tr. at 44:10–11, 52:18–19.)

- 19 -

That said, looking to the totality of the circumstances, as the Court must, there are adequate elements here that lend the call reliability and yield a finding of reasonable suspicion. Those elements are (1) the caller's use of the 9-1-1 emergency system; (2) the hushed and urgent tone and language of the 9-1-1 call; (3) the troublesome nature of the apartment building; and (4) the lack of any other observable suspects in the area by the apartment building. The first two elements address the second, third, and fourth *Torres* factors and the latter two elements bolster the tip's reliability. *See Torres,* 534 F.3d at 211.

### b. The 9-1-1 Call

The first element is the caller's use of the 9-1-1 emergency system. Unlike *J.L.* and *White*, the caller here dialed 9-1-1 rather than the police station. The Third Circuit in *United States v. McCants* noted that where police receive a tip through a 9-1-1 call, thus obviating the first *Torres* factor, it is not necessarily fatal to the tip's reliability. 920 F.3d 169, 176 (3d Cir. 2019), *vacated on other grounds, McCants v. United States,* --- S. Ct. ---, 2019 WL 5150464 (2019) ("[a]lthough it is true that the 9-1-1 call here does not present all of the reliability factors, this deficiency does not preclude a finding of reasonable suspicion"). The Supreme Court in *Navarette* also observed that the use of the 9-1-1 system alone can bolster a tip's reliability because the system has features which allow for identifying and tracing callers. *Navarette*, 572 U.S. at 400. Additionally, the 9-1-1 system often records calls, providing a chance to identify the voice of a false tipster and subject them to prosecution. *Id.* Thus, while a 9-1-1 caller's tip is not *per se* reliable, "a reasonable officer could conclude that a false tipster would think twice before using such a system" and can justify an officer's reliance on information reported on the 9-1-1 call. *Id.* at 401.

Here, the caller provided her name and used the 9-1-1 system, which would allow a reasonable officer to conclude that the caller was putting herself on the line so to speak if the call

was false. The parties have not supplied, and the Court could not find, any precedential case which states that, if the caller cannot be located after the fact, the Court must disclaim the call in its reasonable suspicion analysis, but the Third Circuit in *United States v. Valentine* provides at least some help here. The *Valentine* Court analyzed the reliability of a tip from a face-to-face informant, who left the area after speaking to police. 232 F.3d 350, 354–55 (3d Cir. 2000). The Court stated that "[w]hat matters for our purposes is not that the officers could guarantee that they could track down the informant again," but rather "the question is whether the tip should be deemed sufficiently trustworthy in light of the total circumstances." *Id.* The Ninth Circuit persuasively addressed a similar case in which it declined to impose "a duty on the police to confirm the identity of every 9-1-1 caller who provides his or her name," or to "require the police to conduct further pre-response verification of a 9-1-1 caller's identity where the caller reports an emergency." *United States v. Terry-Crespo*, 356 F.3d 1170, 1175–76 (9th Cir. 2004). In conclusion, the caller's use of the 9-1-1 system and her providing her name lends significant reliability to the call under the totality of the circumstances.

### c. Personal Knowledge and Contemporaneity

The second element is the tone and the language used in the 9-1-1 call, which go to the third and fourth factors from *Torres*. 534 F.3d at 211. The Supreme Court and our Court of Appeals have repeatedly highlighted that a tip is more reliable when the caller shows personal knowledge and contemporaneousness with the reported criminal activity. In *White*, the particularized description of the suspect, vehicle, and movements, some of which the police corroborated, demonstrated that the caller possessed "inside information" and "special familiarity" with the suspect's criminal activity. *White*, 496 U.S. at 332. By contrast, in *J.L.* the Court noted the caller never "explained how he knew about the gun nor supplied any basis for believing he had inside

information." *J.L.*, 529 U.S. at 271. Then in *Navarette*, the Court contrasted that case from *J.L.* The Court observed that the caller claimed eyewitness knowledge of the dangerous driver because she reported being run off the road by him, while the caller in *J.L.* "provided no basis for concluding the tipster had actually seen the gun." *Navarette*, 572 U.S. at 399. The *Navarette* Court also placed significance on the fact that the caller's tip was contemporaneous with her observation of the criminal activity, which negated "the likelihood of deliberate or conscious misrepresentation." *Id.* at 400. The police confirmation of the suspect vehicle's location, which was consistent with the timing of the call and the speed the car was likely traveling, showed this to be true. *Id.*

In *Nelson*, the Third Circuit emphasized that the caller said he was a victim of the crime he reported. *Nelson*, 284 F.3d at 482. Together with the accuracy of the tip and use of a confidential phone line, the inside nature of the information "as well as its urgency" provided indicia of reliability. *Id.* In *Torres*, the Third Circuit underscored a caller's reliability when they (1) provide detailed information not "available to any observer" and (2) recently witness the criminal activity. *Torres*, 534 F.3d at 211. By contrast in *Brown II*, the fact that a friend of the victim provided the location of the two men that police arrested was significant because the friend had no particularized knowledge and was not an eyewitness to the crime. *Brown II*, 448 F.3d at 250.

Here, there are several aspects of the phone call that suggest the caller had inside knowledge. At the suppression hearing, the Court heard a recording of the 9-1-1 call. (Tr. at 15.) In the recording the caller whispers and uses urgent language. For instance, the caller says, "you gotta hurry up to the side entrance; they got guns," "come ASAP," and "are they [(the police)] coming?" Upon listening to the call, the Court finds that the caller's tone was grave, if not fearful. This urgent language and tone of voice used supports the basis for reasonable suspicion under a

totality of the circumstances, because it suggests that the caller possessed real-time, first-hand information about a crime then unfolding before them. *See Nelson*, 284 F.3d at 482.

While there is no evidence to suggest that the caller was a victim of the men she reported, or that she provided information that would not be visible to other observers nearby (if there were any), there are other aspects that suggest contemporaneity. Throughout the call, the caller also uses the present tense— "it's an apartment," "it's the side entrance," "they got guns," and "it's guns, please hurry up." The caller's verb tense, the gravity apparent from her voice, the hushed tone suggesting a fear of being overheard, and her word usage provide a reasonable basis to find: (1) that the caller was witnessing or had just witnessed two men with guns; (2) that this caused her to become fearful, and (3) that she called 9-1-1 as a result. These facts strongly suggest contemporaneousness, as well as personal knowledge. *Torres*, 534 F.3d at 211.

### d. "Troublesome" Apartment Building

The "troublesome" nature of the apartment building is relevant to the Court's analysis, even if Officer Zelen did not characterize the area as "high-crime." (*See* Tr. at 19:25.) The building was known to Officer Zelen because of the routine calls for fights, domestic violence, and service of warrants and protective orders. (*Id.* at 20:12.) The Third Circuit, citing *Wardlow*, held, "officers are not required to ignore the relevant characteristics of a location in determining whether the circumstances are sufficiently suspicious to warrant further investigation." *Nelson*, 284 F.3d at 477. In this case, the Court must consider the fact that police were routinely called to the area for various reasons related to violence or unlawful conduct under a totality-of-the-circumstances analysis. While testimony did not establish the neighborhood was a "high-crime" area, the troublesome nature still serves to incrementally "bolster" the overall reliability of the tip. *Torres*, 534 F.3d at 211. Along with the Third Circuit's holding in *United States v. Foster*, discussed

- 23 -

below, this factor supports the existence of reasonable suspicion. 891 F.3d 93 (3d Cir. 2018).

### e. Lack of Other Suspects in the Immediate Area

A fourth relevant circumstance strengthens the reasonableness of Officer Zelen's suspicion—the lack of any other persons matching the 9-1-1 caller's description in the immediate area. The Government cited *United States v. Foster* in its Response, ECF No. 34, at 5–6, to support its definition of reasonable suspicion. The facts of that case are relevant here. In *Foster*, the Third Circuit examined an officer's reasonable suspicion for stopping a man who matched a description shared over police radio. 891 F.3d at 105. Police received an email about two potentially armed African American men in a stolen Honda in a certain plaza. *Id.* at 104. The following morning, police spotted the car in the specified plaza and detained a man standing next to it. *Id.* Aware that a second armed man was reportedly involved, the detaining officer radioed to other officers that a second suspect was at large. *Id.* The description given over police radio only stated that a potentially armed African American man was at large. *Id.* at 105. The radio message specified no defining physical traits or clothing. *Id.* A few minutes later, an officer observed an African American man nearby walking calmly with a soda. *Id.* The officer followed the man for approximately four minutes to see how he would react. *Id.* at 101. At some point, the officer radioed to ask if anyone had a better description of the suspect, but he received none. *Id.* Then the officer effected a *Terry* stop of the man. *Id.* at 105. The defendant argued that the police merely "pulled over the first black man [they] saw." *Id.* In holding that the officer had reasonable suspicion, the Court recognized that "excessively general" descriptions "in the absence of corroborating observations by police" do not constitute reasonable suspicion. *Id.* (citing *Brown II*, 448 F.3d at 252). Even so, viewing the totality of the circumstances known to the officer, the Court held that the officer had reasonable suspicion because police had set up a search perimeter and the

- 24 -

defendant was the *only* person police had seen who matched the suspect's description. *Id.* Essentially, he was the only African American man police observed in the area—within two-tenths of a mile of the stolen car. *Id.* at 105–06. Furthermore, the officer who detained the defendant was familiar with the area and did not recognize the defendant. *Id.* at 106. The defendant was walking on a rarely trafficked road as well. *Id.* The court placed emphasis on the officer's fourteen years of experience patrolling this area in weighing whether it was reasonable for him to view the defendant's presence in the area as suspicious. *Id.* "The geographic and temporal proximity" of the defendant combined with the lack of any other suspects and the officer's experience overcame several deficiencies. Not only was the description extremely general, even more so than in this case, the stop occurred "mid-morning in a residential area with no reported reputation for criminal activity [which] can weigh against a reasonable suspicion determination." *Id.* at 105.

In this case, the Defendant was geographically and temporally close to the report in the 9-1-1 call. Officers Zelen and Jackson encountered the Defendant in the exact place described in the 9-1-1 call within minutes of the dispatch. It is relevant that although the apartment building and surrounding area may have been predominantly African American in population based on the Public Defender Investigator's episodic, after-the-fact, personal observations at the apartment building, (*Id.* at 92:8–93:9), nonetheless the Defendant was the *only* person in the area matching the description given, (*Id.* at 44:12–22). In fact, he was the only person present at all, (*id.*), and notably was wearing the specific type of black outer garment (a jersey) that the caller reported, (*Id.* at 24:21–22.) In light of *Foster*, the Court takes this fact into consideration in the totality-of-the-circumstances analysis.[10]

---

[10] The Court recognizes that unlike the officer in *Foster*, who had fourteen (14) years of experience, Officer Zelen had only eight (8) months of experience as a police officer on the day of the Defendant's arrest. (Tr. at 81:3–4.) The Court takes this into consideration but finds that Officer Zelen was, based on his testimony, sufficiently familiar with the apartment building for the Court to take the Defendant's sole presence in the area into consideration under the totality

### f. Reasonable Suspicion Existed Here

The Court observes that these factors distinguish the tip here from "anonymous and bare-bones tips that could have been generated by a caller looking out his window." *Nelson*, 284 F.3d at 481. Furthermore, the fact that the 9-1-1 dispatcher did not elicit more details from the caller should not be faulted here. Nothing requires dispatchers or police "to act with the calm deliberation associated with the judicial process." *Torres*, 534 F.3d at 212 (discussing the dispatcher's failure to ask the caller for his name). Rather, the job of an officer is to act, especially where lives could be at stake. *Id.* The officers here responded to a 9-1-1 call, in which the caller provided her name and urgently described two men with guns outside an apartment building, indicating her personal knowledge of the criminal activity and the contemporaneousness of her reporting. The apartment building was previously known to Officer Zelen as troublesome due to routine calls to police for unlawful activity, including fights and domestic violence. Upon arrival, the Defendant not only exactly matched the description provided (particularly as to clothing) by the 9-1-1 caller but was also the *only* person in the area. In these circumstances, had "the police officers . . . done nothing and continued on their way after receiving the informant's tip, the officers would have been remiss." *Nelson*, 284 F.3d at 480 (quoting *Valentine*, 232 F.3d at 356).Viewing the seizure in light of the totality of these circumstances, the Court concludes that Officer Zelen did have reasonable suspicion at the moment he momentarily seized the Defendant at the side entrance of the apartment building.

### B. Officer Conduct After the Defendant's Flight

After Officer Zelen's momentary physical contact with and seizure of the Defendant, the Defendant almost instantly fled. (Tr. at 26:2–9.) The officers gave chase and Officer Zelen briefly

---

of the circumstances, as in *Foster.*

contacted the Defendant but could not grab him. (*Id.* at 28:11–13.) The chase ended when the Defendant became trapped in the backyard of the home on Cherry Way and officers were able to detain him. (*Id.* at 30:17–22.)

*1. Seizures*

For the following reasons, the Court finds and concludes that a seizure occurred when Officer Zelen touched the Defendant during the chase, as well as when officers ultimately detained and then arrested the Defendant. As with the initial contact at the side entrance, Officer Zelen's brief grabbing of the Defendant during the chase to restrain him is a seizure under *Hodari D.* and its progeny. Likewise, the Defendant's ultimate detention in the backyard is a *per se* seizure of the Defendant. *See Terry*, 392 U.S. at 16.

*2. Reasonableness of those Later Seizures*

The Court now turns to the reasonableness of those later seizures. The circumstances that were present when the Defendant was initially, briefly, and lawfully seized carry forward and the Court will consider them under the totality of the circumstances to evaluate whether officers had reasonable suspicion. The Court having already concluded that there was reasonable suspicion to seize the Defendant during the initial encounter also concludes that officers still had reasonable suspicion to seize the Defendant on these two other occasions. The basis of that initial reasonable suspicion was supplemented and strengthened by the Defendant's flight. *Wardlow*, 528 U.S. at 124 ("Headlong flight—wherever it occurs—is the consummate act of evasion: It is not necessarily indicative of wrongdoing, but it is certainly suggestive of such."); *United States v. Brown*, 159 F.3d 147, 149 (3d Cir. 1998) ["*Brown III*"] ("flight combined with other factors may support a warrantless stop and frisk"). After the Defendant broke away and the chase continued, the basis for reasonable suspicion was strengthened again by the Defendant's furtive and evasive

movements observed by Officer Zelen. Officer Zelen saw the Defendant move back and forth and then crouch down in between the Cherry Way home and fence that ran along its perimeter. (Tr. at 29:18–22, 30:5–12, 70:1–6.) In the moment, he believed the Defendant might have been taking up an offensive position. (*Id.*) Under a totality-of-the-circumstances analysis, these actions by the Defendant reinforced Officer Zelen's reasonable suspicion determination. *See United States v. Moorefield*, 111 F.3d 10, 14 (3d Cir. 1997) ("[defendant's] furtive hand movements and refusal to obey the officers' orders . . . embodied the kind of specific, articulable facts that *Terry* contemplates and, therefore, warranted a pat-down search for weapons."). The Court therefore concludes that there was adequate reasonable suspicion for the subsequent seizures after the Defendant fled from the officers.

### 3. Reasonableness of the Arrest

Further, upon discovering the firearm where Officer Zelen saw the Defendant crouch down and make furtive movements, officers had probable cause to arrest the Defendant. Warrantless arrests must be based on probable cause. *Draper v. United States*, 358 U.S. 307, 310–11 (1959). Probable cause requires that the facts and circumstances within the knowledge of the arresting agents at the time of arrest, and of which they have reasonably trustworthy information, are sufficient to warrant a prudent individual in believing that the arrestee had committed or is committing an offense. *Beck v. Ohio*, 379 U.S. 89, 91 (1964). Similar to reasonable suspicion, the probable cause inquiry requires a totality-of-the-circumstances analysis of whether a fair probability existed that a crime had been or was being committed by the arrestee. *Illinois v. Gates*, 462 U.S. 213, 246 (1983).

The Court incorporates the previously discussed events that led up to the Defendant's arrest into its probable cause inquiry—the 9-1-1 call, the statements and tone of the caller, the

troublesome nature of the apartment building, the Defendant's lone presence at the apartment building, the Defendant's flight from officers, and the Defendant's furtive movements at the Cherry Way home. All of these circumstances plus the discovery of the firearm demonstrate a fair probability that a crime had been committed and justified a warrantless arrest. In *United States v. Acosta*, officers gave chase after the defendant fled upon seeing police. No. 16-cr-164, 2017 WL 635111, at *1 (M.D. Pa. Feb. 16, 2017). During the chase, officers briefly lost sight of the defendant, but he was ultimately detained. *Id.* Officers then searched the route along which the defendant ran and discovered a firearm. *Id.* The trial court held that the officers had reasonable suspicion to detain the defendant and that discovery of the gun elevated their suspicion to probable cause for arrest. *Id.* The Third Circuit agreed. *United States v. Acosta*, 751 F. App'x 201 (3d Cir. 2018) (unreported). The Third Circuit held that the following elements added up to probable cause for arrest: (1) the anonymous tip about someone matching the defendant's appearance and location having a gun; (2) the defendant presence in an area "known for crime"; (3) the defendant's unprovoked flight from police while clutching his side as if he had a gun; and (4) discovery of a gun in the defendant's flight path. *Id.* at 203. "That tip, flight, and discovery would lead a reasonable officer to think that [the defendant] had committed a crime, perhaps by possessing the gun illegally or having used it to commit a crime." *Id.* (citing *District of Columbia v. Wesby*, 138 S. Ct. 577, 586–88 (2018); *United States v. Hensley*, 469 U.S. 221, 224, 235–36 (1985); *United States v. Navedo*, 694 F.3d 463, 474 (3d Cir. 2012)).

The analysis here is almost identical. Police responded to a 9-1-1 call about two men carrying guns. Officers discovered the Defendant matching the description provided and in the specified location reported—the "troublesome" apartment building. The Defendant fled from the officers shortly after one of them made initial contact. After detaining the Defendant, officers

found a firearm in the Defendant's path of flight. On those facts alone, *Acosta* suggests that the officers here had probable cause. However, the basis here is even stronger than in *Acosta*. First, the 9-1-1 caller here was not anonymous. Second, Officer Zelen never lost sight of the Defendant as he fled. (Tr. at 28:19–21.) Third, Officer Zelen saw the Defendant crouch down and make furtive movements in the exact location where the gun was recovered. (*Id.* at 30:5–12, 31:1–4, 70:1–6.) Fourth, the gun appeared "brand new" and not as if it had been left outside for a long period of time. (*Id.* at 31: 9–13.) For these reasons, the Court concludes that the officers had probable cause to ultimately arrest the Defendant.

## III. CONCLUSION

For these reasons, the Court finds and concludes that no unlawful seizures or searches occurred and therefore denies the Defendant's Motion to Suppress Evidence at ECF No. 27.

An appropriate Order will follow.

Mark R. Hornak
Chief United States District Judge

Dated: January 28, 2020

cc:     All counsel of record